IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMARR BILLMAN,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **EASTON AREA SCHOOL DISTRICT,** | : | **No. 20-2730** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                                        NOVEMBER 19, 2021

JaMarr Billman contends that his employer, Easton Area School District, discriminated against him based on his race. He asserts that the District unlawfully terminated his employment, retaliated against him for engaging in protected activity, and subjected him to a hostile work environment. The Court denied two motions to dismiss. Still the District had not filed an answer,[1] but filed a motion for summary judgment on all claims, arguing that Mr. Billman fails to demonstrate a dispute as to whether his race was the reason for the termination decision or whether the District's purported non-discriminatory justifications are pretextual. Because Mr. Billman has presented evidence to establish a genuine dispute on each point, the District's motion for summary judgment must be denied.

### BACKGROUND

Easton Area School District hired Mr. Billman as its varsity head wrestling coach in 2016. Mr. Billman reported to the Athletic Director, James Pokrivsak. During Mr. Billman's time as head wrestling coach, four incidents involving family members of wrestling students took place.

---

[1] The District filed an answer on November 17, 2021 after oral argument on the motion for summary judgment. *See* Doc. No. 27.

1

I. **Family Member Incidents**

First, around December 2017, a football coach in the District named Joe McIntyre whose son was a member of the junior high wrestling team began to "berate[]" and "harass[]" Mr. Billman. Doc. No. 19-2 Resp. ¶ 71(a). On one particular occasion, Mr. McIntyre's son was suspended from a match for an unexcused absence from a team event. Mr. Billman was not the coach for the junior high team, but Mr. McIntyre allegedly pulled Mr. Billman into the equipment room, acted aggressively, and told Mr. Billman that he had "zero respect" for him. Doc. No. 19-3 ¶ 42; Doc. No. 19-6, Ex. P.13, at 1.

Second, on March 10, 2018, after a wrestler failed to meet his weight classification at a state wrestling tournament, the wrestler's grandfather (Mr. Miers) allegedly choked Mr. Billman and shouted "I will kill you n****r, if I ever find you by yourself, I will break your knees." Doc. No. 19-3 ¶ 45.

Third, at the same tournament, a parent named Michael Gleason threw a cup of coffee against a wall in a dispute with Mr. Billman and then began spreading rumors about Mr. Billman, including accusations that he was a rapist. Mr. Gleason transferred his son to another school in August 2018. At a hearing related to Mr. Gleason's son's competition eligibility, Mr. Billman testified that his understanding was that the transfer was related to wrestling rather than academics, which, if accurate, would affect the student's eligibility to compete at his new school. Mr. Gleason became angry, threw a chair, and walked toward Mr. Billman "in an aggressive manner as if he was going to fight" him. Doc. No. 15-1, Tr. at 133:2–5.

The fourth family member incident took place around February 2019. Mr. Billman emailed the high school principal, Mr. Geiger, about a threat he received from another parent of a wrestling student, Mr. Krazer. Mr. Krazer had texted him, "I hope for your sake you do not treat my son

2

with the same disdain you have for me." Doc. No. 15 ¶ 73. Mr. Geiger and Alyssa Emili, a District Assistant Superintendent, both testified at their depositions that they did not believe this to be a threat, yet the District still provided Mr. Billman security at the following wrestling match. At that match, Assistant Superintendent Emili sat next to Mr. Krazer, away from the other parents.[2]

## II. School District Response

On March 14, 2018, four days after the March tournament where the Miers grandfather physically and verbally assaulted Mr. Billman, Mr. Billman was notified that his contract would not be renewed and that he was fired. Mr. Billman alleges that, in discussions of whether to terminate his employment, Assistant Superintendent Emili falsely represented that he had multiple disciplinary issues in his personnel file. Kerry Myers, then an Easton School Board member, met with Superintendent John F. Reinhart to discuss the termination decision.

A few days later, the Superintendent notified Mr. Billman that his contract would actually be renewed. Mr. Billman resumed working as the head wrestling coach. Both Athletic Director Pokrivsak and Assistant Superintendent Emili received letters of reprimand for the March 2018 non-renewal from Superintendent Reinhart. Ms. Emili's reprimand letter stated that she had not followed the established policy to attempt to improve coaching performance before termination and it also stated that it was school district policy that "no District employee should ever be the target of anger and threats from anyone without a swift intervention by the District." Doc. No. 19-3 ¶ 66. The letter also noted that "[d]espite the fact that [Mr.] Billman was verbally and physically assaulted, you never inquired as to his welfare or notified law enforcement" and "you utterly failed to recognize the impact your differential treatment of the only black coach in the league would

---

[2] While sitting next to Mr. Krazer could be interpreted as Ms. Emili keeping an eye on Mr. Krazer after the complaint, Ms. Emili did not raise this justification in her deposition. Mr. Billman also alleges that in August 2018, Ms. Emili and Mr. Krazer had promoted a wrestling event together using the team's name and equipment without notifying him. Am. Compl. ¶ 42; Doc. No. 19-2 Resp. ¶ 76(b).

have in the public and the negative impression it would create of our school system." *Id.* Mr. Pokrivsak's reprimand letter raised similar points and additionally noted his shifting reasons for the termination decision and its inconsistency with Mr. Billman's satisfactory performance review. *See* Doc. No. 19-43, at 3 ("I am confused and very disappointed that such contradictory written documents exist regarding the coaching decision.").

Six days after the Miers choking incident, the District banned the grandfather, Mr. Miers, from school events for a year. The District did not ban Mr. Krazer. Mr. Billman asserts that the District took no other action, though it had provided immediate support for white coaches dealing with aggressively problematic parents. For example, Mr. Billman points out that Mr. Pokrivsak called an April 2019 meeting to discuss comments made by parents to a school official at a lacrosse match.

On May 17, 2018, Mr. Billman filed an "Unlawful Harassment complaint" with the District's HR office. Doc. No. 19-3 ¶ 90. For the 2018-19 school year, the District hired David Hightower, who is African-American, as the Director of Human Resources. Mr. Hightower directed two district officials, Tracy Piazza and Ryan Cron, to investigate Mr. Billman's claims. The Piazza and Cron investigation confirmed that Mr. Pokrivsak made the statement "well, don't you know, Gina, I am a racist ha, ha, ha" in the presence of a Black employee. Doc. No. 19-3 ¶¶ 34, 37, 91.[3] In his deposition, Mr. Pokrivsak denied making this comment. The report recommended further investigation of Mr. Billman's claims about a "negative work environment." Doc. No. 19-32, at 3.

---

[3] The report refers to the statement only in general terms and states "The investigators were able to identify that the comment was made however we were unable to determine if it was done in a mocking manner." Doc. No. 19-32, at 2.

4

Mr. Hightower was "relieved of his responsibilities" at the end of the 2018-19 school year and Ms. Emili took over the Human Resources Director responsibilities. Doc. No. 15 ¶¶ 67–68.

In August 2019, Mr. Billman filed a discrimination complaint with the EEOC and Pennsylvania Human Relations Commission.

In September 2019, the District assigned Assistant Athletic Director Elaine Arnts as Mr. Billman's direct supervisor in lieu of Mr. Pokrivsak. Ms. Arnts attended wrestling practices weekly and prepared a set of observations for Mr. Pokrivsak. Her write-up praised Mr. Billman's effective practices, clear communications, daily weight checks for classification purposes, and improvements to the team's success. She noted that several parents were "squirrely," including Mr. Krazer, who had "paired up" with Ms. Emili's husband to run an outside wrestling program that divided the students' time between it and the school team. Doc. No. 19-27, at 1–2. She noted that Mr. Krazer "actively brags within the wrestling community that his mission is to wreck our program because he doesn't like our staff." *Id.*

After Ms. Arnts submitted her comments to Mr. Pokrivsak, he forwarded the notes to Ms. Emili. Mr. Pokrivsak and Ms. Emili took issue with Ms. Arnts's write-up because it purportedly "included hearsay opinions from other people and information not related to [Mr. Billman's] performance." Doc. No. 15 ¶¶ 98–100.[4] They scheduled a Zoom call, during which it is undisputed that they directed Ms. Arnts to revise her observations including deletion of certain portions. The District now frames the revisions as "a teachable moment for an employee who lost her objectivity about this Head Wrestling Coach." Doc. No. 14-1, at 7.[5] Ms. Arnts testified that

---

[4] The District's EEOC Position Statement states "Ms. Emili was painfully aware of [Mr.] Billman's missteps, mistakes, failures, and insolence with authority to allow another performance evaluation to occur without truthful information having been included." Doc. No. 19-39 ¶ 10.

[5] A jury could well find that Ms. Emili, not Ms. Arnts, was the one who "lost her objectivity," given that the notes sent by Ms. Arnts to Mr. Pokrivsak implicated Ms. Emili's husband in running the alternative wrestling program that competed for the students' time. Doc. No. 19-27, at 2.

5

she felt her job was at risk if she did not make Mr. Pokrivsak and Ms. Emili's changes. Ms. Arnts shared her original observations with Mr. Billman, noting that she "could get fired for doing this." Doc. No. 15 ¶ 102. Mr. Pokrivsak then incorporated the "revised" (less positive) observations into a 2019-20 performance evaluation that, for the first time, rated Mr. Billman as "needs improvement."

### III. Termination of Mr. Billman's Employment

After Mr. Billman received a Right to Sue letter from the EEOC, his counsel reached out to the District's counsel to discuss resolution of the EEOC and PHRA claims in May 2020. According to the District, it made the decision to terminate Mr. Billman's employment "the next day." Doc. No. 19-39, Ex. P.64 ¶ 10. Mr. Billman states that "he was provided his performance [review] by Mr. Pokrivsak on May 27, 2020 and despite writing a rebuttal to the evaluation disputing the evaluation, he was terminated after." Doc. No. 19, at 22. Mr. Geiger testified that the people who decided to terminate Mr. Billman's employment were Mr. Geiger, Mr. Pokrivsak, and Ms. Emili.

The District responded to the EEOC charge with a position statement on August 25, 2020. The District's position statement asserts that "[Mr.] Billman's poor attitude, performance and demeanor wasn't worth the $10,000 per annum spent to run the program" and that his "performance evaluation [] ultimately became the impetus for the Board's choice to separate itself, and the District, from him as head wrestling coach." Doc. No. 19-39 ¶¶ 9, 14. The statement also asserts that "[Mr.] Billman's disappointing performance, year after year, only deteriorated, although, in spite of the deterioration in many respects, was moderately successful in some respects given the amount of money invested to run the wrestling program." Doc. No. 19-39, Ex. P.64 ¶ 9. Mr. Billman was replaced by a white coach.

Mr. Billman brings claims for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. §§ 952 *et seq.* (Count I), harassment/hostile work environment under Title VII and the PHRA (Count II), retaliation under the Title VII and the PHRA (Count III), and violations of Section 1981 and 1983 (Count IV).

## LEGAL STANDARD

A court can grant a motion for summary judgment if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.* "Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 888–89 (E.D. Pa. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw factual inferences in the non-moving party's favor. *See Doe v. CARS Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008). Summary judgment should "be used sparingly in employment discrimination cases," particularly "when . . . intent is at issue." *Id.* at 369; *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). To survive at the summary judgment stage, a non-movant need only show that "sufficient evidence support[s] the claimed factual dispute" and

a judge or jury must resolve "the parties' differing versions of the truth" at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

## DISCUSSION

The District argues that Mr. Billman has not introduced evidence sufficient to dispute its defenses to the discrimination, hostile work environment, retaliation, and §§ 1981 and 1983 claims. Because factual disputes abound, the Court briefly and only addresses some of the key disputes that preclude summary judgment for each claim.

**I.    Discriminatory Termination**

Title VII and the PHRA prohibit an employer from discriminating on the basis of race. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973); *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."). The plaintiff faces the initial burden to establish a prima facie case of discrimination. Then, if a prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If such a reason is offered, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons were "not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Mr. Billman has set forth sufficient facts to establish a prima facie case of termination on the basis of his race. Mr. Billman argues that the District did not provide him a performance improvement plan prior to termination, as it did for a white coach and as required by District policy. Mr. Billman also argues that the District provided inconsistent and discredited reasons for the termination decision. Although this Court recognizes that the 2018 non-renewal is time-barred and cannot serve as the basis for the discriminatory termination claim, *see* Doc. No. 20, at 6, this

8

background information provides further support for the hasty nature of the District's termination decisions and ongoing differential treatment of Mr. Billman compared to the District's white coaches.

The District asserts several non-discriminatory bases for the termination. Thus, the Court's analysis hinges on whether Mr. Billman has introduced evidence that the District's asserted reasons were "not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "When the defendant's intent has been called into question, the matter is within the sole province of the factfinder." *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989).

First, the District's own employment policy establishes that a "needs improvement" rating on a performance evaluation calls for a performance improvement plan and a time period to improve. Doc. No. 19-3 ¶ 84. The District provided this opportunity for a white coach prior to termination, but did not provide such an opportunity to Mr. Billman. The District attempts to justify this disparity by framing the time period between Mr. Billman's 2018 and 2020 non-renewals as putting him on notice of his need to improve in a way that substituted for a performance improvement plan. However, Mr. Billman was not provided a written performance improvement plan as required. Further, it is unclear what exactly Mr. Billman should have known to "improve," given that his employment was initially terminated after the Miers grandfather assaulted *him* and called *him* a racial slur.

Second, Mr. Billman has provided evidence to establish a genuine dispute as to the District's reasons for his termination. When a plaintiff shows that the reasons given for termination were not consistent throughout the proceedings, "this may be viewed as evidence tending to show pretext, though of course it should be considered in light of the entire record." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001). A plaintiff may also show

contradictions in "core facts" alleged to justify termination decisions. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006).

In its EEOC Statement, the District cited Mr. Billman's poor attitude and performance as the reason for the termination decision, including a claim that the wrestling team's "disappointing performance, year after year, only deteriorated." Doc. No. 19-39, Ex. P.64 ¶ 9. Now, the District asserts that problems with parent relationships, departure of student athletes, and lack of "fit" were the reasons for the decision to terminate Mr. Billman's employment. Doc. No. 14-1, at 6–7. Mr. Billman challenges these justifications as inconsistent and lacking credibility based on the praise he received for the wrestling team's performance during his tenure. He asserts that, during the 2018-19 school year, he was complimented by the District Superintendent, Mr. Reinhart, for five students making it to the state competition. At summary judgment, the District provides no support for its earlier argument that the wrestling team performed poorly, instead now arguing that Mr. Billman was too focused on technique relative to parent relationships.

Mr. Billman also challenges the student departure justification. He points out that the two departures by members of the wrestling team both took place in the 2017-18 school year, before his first non-renewal. He also notes that his number of departures (two) was lower than those from the football team (four), lacrosse (five), and basketball (three), all of which were headed by white coaches who received no disciplinary action. The District provides no justification for this apparently inconsistent standard.

Because Mr. Billman has raised genuine disputes of material fact about the non-discriminatory justifications for the termination of his employment, the Court will deny summary judgment on this claim.

## II. Hostile Work Environment

In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish, "by the totality of the circumstances, the existence of a hostile or abusive *environment* which is severe enough to affect the psychological stability of a minority employee." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (internal quotation marks omitted). "Specifically, a plaintiff must show: (1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Id.* Mr. Billman argues that "courts must resist the appeal to 'disaggregate' each non-overt act and consider it in a vacuum." *Williams v. Pa. State Police*, 481 F. Supp. 2d 424, 429 (W.D. Pa. 2007) (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999).

Mr. Billman has introduced evidence from which a reasonable jury could find that he was subjected to a hostile work environment. Multiple parents assaulted or threatened him over several months, with a limp—at best—response from the District. While the District argues that these family member acts and its response were not based on his race, at least one of the family members used the "n****r" racial epithet and physically assaulted Mr. Billman. By the District's own admission, it never inquired into Mr. Billman's welfare after this assault. Another family member spread shocking accusations about Mr. Billman that would disturb any reasonable person (e.g., accusations that he was a rapist). Despite the severity of these physical and verbal attacks, the

n/a
n/a

District provided little support to Mr. Billman. In contrast, Mr. Pokrivsak reacted swiftly to disrespectful comments made to a school official at a lacrosse match.[6]

Mr. Billman has also introduced evidence that he did in fact fear for his safety. For example, in an email to Mr. Pokrivsak about the text message from Mr. Krazer, Mr. Billman asked, "Will it take me to get physically assaulted again in order for a ban to be put in place?" Doc. No. 19-33, Ex. P.49, at 1. When the District did provide security for Mr. Billman, Ms. Emili sat next to Mr. Krazer. Further, Mr. Billman introduces testimony that Ms. Emili's husband worked with Mr. Krazer to host alternative practices, possibly in pursuit of Mr. Krazer's aim to "wreck" Mr. Billman's program at the school. Doc. No. 19-27, at 2. And when Mr. Billman filed complaints about racial discrimination that Human Resources actually began to investigate, the District removed Mr. Hightower as Human Resources Director and put the arguably conflicted Ms. Emili in his place.

While the District provided Ms. Arnts as a "buffer" for Mr. Billman and Mr. Pokrivsak, Doc. No. 15 ¶ 92, Ms. Emili and Mr. Pokrivsak then forced Ms. Arnts to remove positive comments from her evaluation of Mr. Billman. The District argues that "[t]he revisions requested were to delete hearsay and opinion comments unrelated to her own direct observations that coincided with others' observations of Billman's performance." Doc. No. 14-1, at 7. However, it is unclear why hearsay rules would apply to such an evaluation or how Ms. Emili or Mr. Pokrivsak would be better-suited to form such opinions than the person assigned to attend wrestling practices and supervise Mr. Billman. It is unclear whether other personnel files and evaluations were likewise scrubbed of "hearsay." The validity of Ms. Arnts's positive observations (and her

---

[6] According to the email sent by Mr. Pokrivsak, the disrespectful comments included "parents/spectators coaching from the stands, yelling at officials, disrespect as an Easton representative, and yelling negatively about young adults and their playing abilities." Doc. No. 19-44, Ex. P.81, at 1.

supervisors' insistence on their removal from the formal evaluation) are, at minimum, factual disputes. The District also does not contest respondeat superior liability for Ms. Emili or Mr. Pokrivsak.

Based on the evidence introduced by Mr. Billman, a reasonable jury could find that Mr. Billman has established a hostile work environment claim.

## III. Retaliation

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against h[im]; and (3) there was a causal connection between h[is] participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (internal quotation marks omitted). The Third Circuit "case law has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson*, 260 F.3d 265 at 288. Evidence of either factor may meet the third prong to establish a causal connection. *Id.*

The District itself asserted in its response to Mr. Billman's EEOC charge that it made the decision to terminate Mr. Billman's employment the day after his counsel reached out to the District regarding settlement of his EEOC claim. A settlement demand based on an EEOC charge is protected activity for purposes of a retaliation claim. *See Sampson v. Sch. Dist. of Lancaster*, No. 05-cv-6414, 2009 WL 1675083, at *7 (E.D. Pa. June 12, 2009). This timing certainly provides a basis upon which a jury could infer that the termination decision was caused by the EEOC settlement demand. Even if the District challenges the admissibility of testimony regarding the settlement offer, the hasty 2018 non-renewal decision,[7] the removal of Mr. Hightower after his

---

[7] The Court discusses the role of the 2018 non-renewal decision as background in its April 22, 2021 Memorandum denying Easton Area School District's Motion to Dismiss. Doc. No. 20, at 6.

support for Mr. Billman, and the excision of Ms. Arnts's positive comments provide evidence of ongoing antagonism for a retaliation claim. Therefore, Mr. Billman also introduces sufficient evidence to survive summary judgment on his retaliation claims.

## IV. Section 1983 Claim

Lastly, Mr. Billman asserts a Section 1983 claim based on violations of Section 1981 and the Fourteenth Amendment. To establish a discrimination claim under § 1981, "a plaintiff must show '(1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981.'" *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010) (quoting *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002)). This analysis follows the usual *McDonnell Douglas* Title VII framework. However, in order to survive summary judgment against a government entity, Mr. Billman must "show that the [District] 'implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated,' or acted 'pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels.'" *McGovern v. City of Phila.*, 554 F.3d 114, 121 (3d Cir. 2009) (quoting *Monnell v. N. Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)); *see also id.* ("Although *Monell* concerned § 1983 actions, the Supreme Court in *Jett* extended *Monell* to cases arising under § 1981."). A "discriminatory policy need not be caused by an affirmative act, but may occur 'by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity.'" *Oaks v. City of Phila.*, 59 Fed. App'x 502, 503 (3d Cir. 2003) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

14

Mr. Billman argues that the District carried out a longstanding practice of applying policies such as performance improvement plans and parental responses differently for black and white coaches. He introduces evidence that a white football coached received a performance improvement plan and opportunity to improve prior to termination and that a white lacrosse coach received support from Mr. Pokrivsak in response to negative parent comments. He (Mr. Billman) contends he received neither.

The District has not answered Mr. Billman's complaint and only briefly discusses his Section 1983 claims in its motion for summary judgment. The District appears to concede that the outcome of the Section 1983 claims depends on the Title VII claim. Doc. No. 14-1, at 13–14 ("Thus, the same analysis that applied to Plaintiff's Title VII and PHRA claims applies here."). Therefore, the District's motion for summary judgment on the Section 1983 claim must also be denied.

## CONCLUSION

For the foregoing reasons, the Court denies Easton Area School District's motion for summary judgment on all claims. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE