## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMARR BILLMAN,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EASTON AREA SCHOOL DISTRICT,** | : | **No. 20-2730** |
| *Defendant* | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                                    AUGUST 5, 2022

JaMarr Billman brought this action against his former employer, Easton Area School District, alleging racial discrimination, a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act, and 42 U.S.C. § 1983. Easton Area School District asserted an affirmative defense that Mr. Billman failed to mitigate his damages,[1] on which the Court instructed the jury. After a trial, the jury found that Mr. Billman had proved each of his claims for racial discrimination, a hostile work environment, and retaliation by the District and awarded Mr. Billman compensatory damages. The Court instructed the jury not to include back pay or front pay in its award of compensatory damages and did not seek an advisory verdict on these issues.

Mr. Billman now asks the Court to award back pay with prejudgment interest.[2] Based on the following findings of fact and conclusions of law, the Court awards Mr. Billman $20,490 in back pay and $858.11 in prejudgment interest.

---

[1] The Court granted the District leave to amend its answer to include this affirmative defense on the last day of trial pursuant to Federal Rule of Civil Procedure 15(b)(1).

[2] Mr. Billman does not seek reinstatement or front pay.

1

FINDINGS OF FACT[3]

Mr. Billman's employment as Easton Area School District's head varsity wrestling coach began in 2016.  June 21, 2022 Tr. at 35:13, Doc. No. 91; Ex. P-25 at EASD002432.  The wrestling position was a part-time job for Mr. Billman, who has worked at the Northampton Juvenile Justice Center in Easton, Pennsylvania for approximately 16 years.  June 21, 2022 Tr. at 31:17–25, Doc. No. 91.  His varsity wrestling coach salary for the 2016–17 season was $10,047.  Ex. P-25 at EASD002432.  His salary increased to $10,245 by the 2019–20 season.  Ex. P-25 at EASD002429.

Each year that the District renewed his annual contract, he continued as the varsity wrestling coach without reapplying for his position.  June 21, 2022 Tr. at 38:23–39:1, Doc. No. 91.  Although a nonrenewed coach could theoretically reapply for his or her position, a nonrenewal is typically viewed as a termination.  June 22, 2022 Tr. at 188:24–189:1.

On March 14, 2018, Athletic Director James Pokrivsak informed Mr. Billman that his contract would not be renewed.  June 21, 2022 Tr. at 72:14–73:24, Doc. No. 91; June 27, 2022 Tr. at 15:17–19, Doc. No. 95; Ex. P-78 at EASD003618.  However, the District then reversed this decision, and Mr. Billman returned as the varsity wrestling coach for the 2018–19 season.  June 21, 2022 Tr. at 76:7–78:7, Doc. No. 91.  Mr. Billman filed an EEOC charge on August 28, 2019 and received a right to sue letter on March 12, 2020.  Am. Answer ¶¶ 6–7, Doc. No. 85; Am. Compl. ¶¶ 6–7, Doc. No. 10.

In late May 2020,[4] the District again informed Mr. Billman that his employment would not be renewed for the following season.  June 22, 2022 Tr. at 69:21–70:13, Doc. No. 92; June 24,

---

[3] The Court notes that neither party complied with the Court's order to include "*specific* reference to testimonial or documentary evidence that has been admitted" in their proposed findings of fact and conclusions of law.  Order at 1 n.1, Doc. No. 83 (emphasis added).

[4] Mr. Billman asserts that the exact date of his nonrenewal was May 29, 2020.  The District does not contest this date, and it is consistent with the timing of surrounding events, so the Court accepts this proposed

2022 Tr. at 18:16–18, Doc. No. 94; June 27, 2022 Tr. at 19:16–25, Doc. No. 95.  The District

opened his position shortly thereafter and completed the hiring process for a new coach by June

30, 2020.  June 22, 2022 Tr. at 70:9–10, Doc. No. 92; June 24 Tr. at 18:19–21, Doc. No. 94.

After his nonrenewal in May 2020, Mr. Billman did not reapply for his position.  June 28,

2022 Tr. at 20:6–8, Doc. No. 96.  Mr. Billman was not told that he could reapply, and he did not

wish to continue to experience the treatment for which he brought this lawsuit.  June 28, 2022 Tr.

at 20:9–17, Doc. No. 96.

Back in 2018, Mr. Billman applied for the head wrestling coach position at Bethlehem

Catholic while still employed at Easton Area School District.  June 28, 2022 Tr. at 18:22–19:6,

Doc. No. 96.  He did not receive an interview.  June 28, 2022 Tr. at 19:2–3, Doc. No. 96.  After

Mr. Billman's nonrenewal in 2020, he was aware of open head wrestling coach positions in

Northampton School District, Wilson School District, and Pen Argyl School District.  June 28,

2022 Tr. at 17:5–18:4, Doc. No. 96.  He was unaware of head coaching positions at Emmaus and

Pleasant Valley that may have been open.  June 28, 2022 Tr. at 17:14–17, 18:5–8, Doc. No. 96.

Following the nonrenewal of his contract, Mr. Billman did not apply for other head

coaching positions because he "was not ready to go back to coaching" after his experience at

Easton Area School District.  June 28, 2022 Tr. at 19:12–20:5, Doc. No. 96.  He felt "mentally

beat down" and skeptical about his future at other districts given his experience at his own alma

mater.  *Id.*  For example, he experienced ongoing anxiety and did not feel safe in the wrestling

gym after a 2018 incident in which a family member of a wrestling student choked Mr. Billman

and called him a racial epithet at the state tournament.  June 21, 2022 Tr. at 66:21–68:15, Doc. No.

91; June 22, 2022 Tr. at 14:13–15:1, 20:23–21:1, Doc. No. 92.  Although the District discounted

---

finding of fact.  Pl.'s Proposed Findings of Fact ¶ 8, Doc. No. 88; Def.'s Proposed Findings of Fact ¶ 8,
Doc. No. 90.

this assertion as lacking additional support, it did not introduce contrary evidence.  *See* June 28, 2022 Tr. at 143:11–16, Doc. No. 96 ("[W]e didn't really find out what the evidence was on that, whether it was a throttling or what, but Mr. Billman's here so he wasn't choked.  (Indicating)  He's here with us and he looks fine.").  Mr. Billman began attending therapy after his contract nonrenewal.  June 28, 2022 Tr. at 19:23–20:2, Doc. No. 96.

After a jury verdict in his favor, Mr. Billman requests a backpay award of $20,490 (for two years' salary) plus interest of $698.17.

**LEGAL STANDARD**

"[T]he purpose of Title VII [is] to make persons whole for injuries suffered on account of unlawful employment discrimination."  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975). When a jury finds that racial discrimination has taken place, "the district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future."  *Id.* (internal quotation marks omitted).  To this end, Title VII provides for back pay if the defendant is found to have intentionally discriminated against the plaintiff.  42 U.S.C. § 2000e-5(g)(1); *Bereda v. Pickering Creek Indus. Park, Inc*., 865 F.2d 49, 54 (3d Cir. 1989).  "[B]ack-pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of Title VII."  *Caufield v. Ctr. Area Sch. Dist*., 133 F. App'x 4, 13 (3d Cir. 2005).

"Despite a presumption in favor of a back pay award, successful Title VII claimants have a statutory duty to mitigate damages."  *Booker v. Taylor Milk Co*., 64 F.3d 860, 864 (3d Cir. 1995) (citations omitted).  The employer bears the burden to prove, by the preponderance of the evidence, that the plaintiff failed to mitigate his or her damages.  *Id.*  "To meet its burden, an employer must demonstrate that 1) substantially equivalent work was available, and 2) the Title VII claimant did

4

not exercise reasonable diligence to obtain the employment." *Id.*  A determination of whether the Title VII claimant exercised reasonable diligence should take into account  "the individual characteristics of the claimant and the job market." *Id.* at 865.

Some courts in the Third Circuit have held that the employer can instead prove that the employee failed to mitigate because he or she "withdrew entirely from the employment market." *Caufield*, 133 F. App'x at 11; *see also DiFlorio v. Kleckner*, No. 11-cv-4405, 2012 WL 748910, at *12 (E.D. Pa. Mar. 7, 2012) ("[A]n employer need not provide evidence that substantially equivalent work is available if its former employee has entirely withdrawn from the job market."). If a plaintiff does not seek any other employment, the court considers whether this decision is justified.  *See Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 89 (3d Cir. 2009) ("[O]ne must make 'reasonable efforts' to mitigate [] loss of income, and only *unjustified* refusals to find or accept other employment are penalized.") (emphasis added).

"Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [U.S. Equal Employment Opportunity] Commission." 42 U.S.C. § 2000e-5(g)(1). Title VII also authorizes prejudgment interest for back pay. *Booker*, 64 F.3d at 868.  This award compensates "for the loss of the use of money that the plaintiff otherwise would have earned had he not been unjustly discharged."  *Id.*  There is "a strong presumption in favor of awarding prejudgment interest, except where the award would result in 'unusual inequities.'"  *Id.*

## DISCUSSION

The Court begins with the presumption in favor of a back pay award.  In opposing a back pay award, the District bears the burden to demonstrate that Mr. Billman failed to mitigate his damages.  Because the District has not introduced evidence that other positions were available and

substantially equivalent and that Mr. Billman failed to exercise reasonable diligence, the District has not met this burden.

## I.     The District Has Not Established That Substantially Equivalent Work Was Available

First, the District bears the burden to establish that "substantially equivalent work was available." *Booker*, 64 F.3d at 864. "Substantially equivalent employment for purposes of Title VII litigation is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." *Caufield*, 133 F. App'x at 11.

Here, the District argues that it has established that substantially equivalent head wrestling coach positions were available at other school districts. The District emphasizes that the other school districts it has listed are within geographic proximity to Easton. But the District has not even presented any evidence that the positions were actually open, apart from asking Mr. Billman whether he was aware of them. *Cf. Caufield*, 133 F. App'x at 11 ("The only evidence submitted by [the school district] demonstrating that there were substantially equivalent positions available elsewhere consisted of four affidavits from officials at random school districts in the area indicating that each district had some form of elementary teaching positions open between 1999 and 2004."). For example, Mr. Billman responded that he was not aware of a vacant position "at the Emmaus School District this year in 2022." June 28, 2022 Tr. at 17:14–17, Doc. No. 96. The District presented no evidence for the Court to determine whether such a position actually existed.

As to the positions about which Mr. Billman testified he was aware, the District has not established that the compensation, working conditions, or status of any such positions were substantially equivalent. *Caufield*, 133 F. App'x at 11. The District introduced no evidence of the compensation levels of similar positions at any other school districts. Instead, the District has suggested that other compensation may *not* be equivalent by asserting that Mr. Billman's pay at

6

Easton Area School District was "one of the highest salaries of all coaches" in the District.  Def.'s Proposed Findings of Fact ¶¶ 2–4, Doc. No. 90.

The District also failed to establish that the status of any open positions would accord with Mr. Billman's status as the Easton Area School District varsity wrestling coach.  Mr. Billman testified that Easton Area School District's wrestling program had a long and prestigious history. June 22, 2022 Tr. at 40:25–41:5, Doc. No. 92 (testifying that succeeding in wrestling at Easton "was a huge deal" including "over 70-plus years consecutive of having a District Champion"). The District presented no evidence that any open positions would provide "substantially equivalent" working conditions or status.

Therefore, the District did not meet its burden to establish that substantially equivalent positions were available for Mr. Billman to mitigate his damages.

## II.    The District Has Not Established That Mr. Billman Was Not Reasonably Diligent

The District also argues that Mr. Billman should not receive backpay because "unjustified refusals to use reasonable diligence to find or accept other employment are penalized."  Def.'s Proposed Findings of Fact, at 5 ¶ 9, Doc. No. 90.  But even if substantially equivalent work was available (which has not been established), the District has not established that Mr. Billman failed to exercise reasonable diligence to obtain another position.

The District faces the burden of proving that Mr. Billman failed to utilize reasonable diligence in seeking other employment.  Yet there is no evidence as to what efforts Mr. Billman did or did not take to secure a new position apart from his failure to apply to certain positions that, according to the District (without supporting evidence), were open.  For example, it is unknown whether Mr. Billman tried to apply to other jobs besides the Bethlehem Catholic coaching position.

"The reasonableness of a Title VII claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market." *Caufield*, 133 F. App'x at 11.  The claimant's personal difficulties may factor into this analysis, even if they are not related to the unlawful conduct.  *See, e.g.*, *Atl. Limousine, Inc. v. N.L.R.B.*, 243 F.3d 711, 721 (3d Cir. 2001) (finding that the defendant failed to meet its burden where the plaintiff was caring for his mother, who was ill, and this affected his ability to look for work during the period in question).

The District argues that Mr. Billman "did not apply for open and available positions from 2020–2022 for personal reasons and not because of [] unlawful conduct on the part of the Defendant, Easton Area School District."  Def.'s Proposed Findings of Fact, at 4 ¶ 29, Doc. No. 90.  But the evidence presented at trial established that Mr. Billman's difficulties were, in fact, "because of [] unlawful conduct on the part of the Defendant, Easton Area School District."  *Id*. Mr. Billman testified that his experience at the school district was so traumatic that he lost faith in his ability to coach and began to attend therapy.  *See Miller v. Bd. of Regents of Univ. of Minn.*, 402 F. Supp. 3d 568, 587 (D. Minn. 2019) (noting that "the stress and sorrow associated with the prospect of [a coach] having to move away from the community in which []he had put down roots" could affect future job prospects).  While this difficulty could be framed as a "personal reason," it is a result of the District's unlawful conduct.[5]  And even if it was not related (which it is), it would still be relevant to an evaluation of Mr. Billman's diligence.  *Atl. Limousine, Inc.*, 243 F.3d at 721.

The Court returns to the proposition that back pay is an equitable remedy intended to make the plaintiff whole.  On the one hand, a former employee may not refuse to seek alternative

---

[5]  The District also suggested at trial that Mr. Billman should have reapplied to the position for which his contract was not renewed in 2020.  Based on the evidence presented at trial, reapplying for the position from which he had just been "nonrenewed" would be an unreasonable effort to require.  *See also Miller*, 402 F. Supp. 3d at 575, 587 (discussing a coach's nonrenewal as a termination and the unique reputational effects).

employment to mount unjustified damages.  On the other hand, an employer who has diminished the former employee's labor market expectations (and future success) may not then use the effects of its own unlawful conduct to avoid compensating the former employee for lost pay.  *See Caufield*, 133 F. App'x at 13 ("[B]ack-pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of Title VII."); *cf. Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020–21 (9th Cir. 2000) (denying back pay where, in contrast to Mr. Billman, the former employee's "decision to withdraw from the workforce [was] not only uncompelled by her situation but also unaffected by the defendant's discriminatory behavior").  Here, Mr. Billman's diminished labor market expectations were a result of the District's unlawful conduct.  Thus, the Court finds that the requested back pay award of two years' pay is an appropriate and necessary award to make Mr. Billman whole.  Based on Mr. Billman's rate of pay of $10,245 annually in the 2019–2020 season, the Court awards $20,490 in back pay as requested.[6]

## III.    Prejudgment Interest

Lastly, the Court considers whether and how to award prejudgment interest on the back pay award.  "[B]y its very nature the calculation of an award for lost earnings must be a rough approximation" and "sustained price inflation can make the award substantially less precise." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983).  Particularly during times of high inflation, courts must address the "substantial risk" that the back pay award "will prove to have little relation to the lost wages it purports to replace" absent an interest adjustment.  *Id.* at 547.  The purpose of prejudgment interest on back pay is to "compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned had he not been unjustly

---

[6] Although back pay is available for up to two years *prior* to the filing of an EEOC charge, and Mr. Billman actually filed his EEOC charge well before his May 29, 2020 nonrenewal, he has chosen the simpler approach of a flat two-year request for the back pay award.  This is appropriate because Mr. Billman continued to earn income between filing an EEOC charge and his May 29, 2020 nonrenewal.

discharged." *Booker*, 64 F.3d at 868.  Thus, there is a "strong presumption" in favor of awarding prejudgment interest on a back pay award absent "unusual inequities."  *Id.*

The District does not argue that an award of interest would be inequitable, and the Court finds that it is not.  Mr. Billman requests that the Court calculate interest using the IRS-adjusted prime rate pursuant to 26 U.S.C. § 6621.  The Third Circuit Court of Appeals has approved of this rate for calculating prejudgment interest on Title VII back pay awards.  *See Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996).  From the day after Mr. Billman's nonrenewal to the judgment, the annual IRS-adjusted prime rate, which is updated quarterly, ranged from three to five percent. *See Policy, Data, Oversight*, Office of Personnel Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/interest-rates-used-for-computation-of-back-pay/ (hereinafter "OPM Website").  Mr. Billman proposes compounding the interest on an annual basis, which is also typical.  *Frazier v. Se. Pa. Transp. Auth.*, 814 F. Supp. 11, 13 (E.D. Pa. 1993); *but see Ortega v. Chicago Bd. of Educ.*, 280 F. Supp. 3d 1072, 1098 (N.D. Ill. 2017) ("Because a plaintiff generally is paid at regular intervals throughout the year, such as bimonthly or every other week, interest technically should be compounded going forward from each paycheck.").

Mr. Billman requests a total of $698.17 in prejudgment interest, using the IRS-adjusted prime rates applied to his annual salary and compounded annually.  *See* Pl.'s Proposed Findings of Fact Ex. A, Doc. No. 88-1.  The District does not challenge this calculation and has made no arguments of its own regarding interest calculation.  However, there are two primary aspects of Mr. Billman's calculations that the Court will adjust to account for the lost use of his back pay.

*First*, Mr. Billman's calculations do not reflect the periodic nature of employee pay, in which the principal (amount of pay due) begins at zero and grows over time.  Mr. Billman's

10

"monetary injuries were incrementally inflicted from the date of his termination through entry of judgment as each pay period passed and [he] went unpaid." *Reed v. Mineta*, 438 F.3d 1063, 1067 (10th Cir. 2006); *id.* ("The purpose of making discrimination victims whole is limited, however, by recognition that prejudgment interest does not accrue until the victim actually sustains monetary injury."); *Chandler v. Bombardier Cap., Inc*., 44 F.3d 80, 84 (2d Cir. 1994) ("[I]nterest should have run from the date of the missed payments, rather than from the date of termination."); *Shorter v. Hartford Fin. Servs. Grp., Inc*., No. 03-cv-0149, 2005 WL 2234507, at *7 (D. Conn. May 31, 2005); *Rush v. Scott Specialty Gases, Inc*., 940 F. Supp. 814, 818 (E.D. Pa. 1996).[7]

As such, the principal cannot be the "entire back pay award from the date of his termination" because he would not have been paid the lump sum of two years' pay on the day his employment was terminated. *Reed*, 438 F.3d at 1066. Similarly, Mr. Billman would not have received one year's worth of pay at the beginning of each year, as the calculations he submitted would suggest. Rather, the amount the District owed him grew with each passing pay period. *See id.*; *see also Caffey v. Unum Life Ins. Co*., 302 F.3d 576, 585 (6th Cir. 2002) (affirming "use of a stream-of-benefits model to calculate prejudgment interest" based on monthly payments due in ERISA context); 5 C.F.R. § 550.806(a)(1) ("Interest begins to accrue on the date or dates (usually one or more pay dates) on which the employee would have received the pay . . . if the unjustified or unwarranted personnel action had not occurred.").

---

[7] In order to precisely calculate the prejudgment interest on Mr. Billman's back pay award, the Court would need to know his pay periods and pay dates, as well as the District's treatment of summer pay. However, neither party has provided this information, and the Court finds that using the end of each month adequately reflects the periodic nature of the payments in a manner proportional to the needs of this case. *See Gelof v. Papineau*, 829 F.2d 452, 456 (3d Cir. 1987) ("When prejudgment interest is to be awarded on back pay which should have been paid over a number of years the trial court must be afforded reasonable discretion in selecting intervals for convenience in making the interest calculations.").

Mr. Billman's proposed calculations instead use his annual salary as a flat principal amount. *See* Ex. A, Doc. No. 88-1. This does not account for the fact that the principal began at zero and grew at the end of each pay period, only ultimately reaching $20,490 for two years of unpaid salary at the end of the two years. The proper calculation should use a growing principal that includes prior unpaid salary periods. *See O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 445–446 (E.D. Pa. 2000).

*Second*, Mr. Billman's proposed calculations end at the verdict date of June 29, 2022 rather than the judgment date. No party could anticipate the date that the Court would enter the judgment, but the pre-*judgment* interest should include the time until the judgment date. *See Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1103 (3d Cir. 1995); *cf. Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) (holding that "postjudgment interest properly runs from the date of the entry of judgment," not the verdict date).

"In deciding backpay issues, a district court has wide latitude to 'locate a just result' and to further the 'make whole remedy of Title VII in light of the circumstances of a particular case.'" *Taxman*, 91 F.3d at 1565 (quoting *Albemarle Paper Co.*, 422 U.S. at 424–25). The Court exercises its discretion to adjust the proposed calculations to account for the periodic nature of salary payments and for the time period between entry of the verdict and final judgment.[8] *Id.*; *Robinson v. Se. Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 897 (3d Cir. 1993). Based on its own calculations, the Court awards a total of $858.11 in prejudgment interest.[9] *See* Appendix.

---

[8] Mr. Billman's calculations also err by: (1) using 30 days for March 2022; (2) beginning on the day of the contract nonrenewal rather than the following day (there was no evidence that he was not paid for his last day); (3) compounding interest at the end of the calendar year rather than each year of interest accrual; (4) using a "daily" interest rate that is instead a quarterly rate (*e.g.*, in footnote 5, the 3% annual rate (which itself is mislabeled as a "quarterly" rate, *see* OPM Website) is divided by 4 to arrive at 0.75%, which would be a quarterly rate); and (5) not accounting for the end date of the two years of back pay (May 2022). Ex. A, Doc. No. 88-1. The Court corrects these errors in its own calculations. *See* Appendix.

[9] For the additional days beginning July 1, 2022, the annual rate is 5 percent. *See* OPM Website, *supra*.

**CONCLUSION**

For the foregoing reasons, the Court grants Mr. Billman's request for back pay and prejudgment interest.  The Order of judgment will follow.

**BY THE COURT:**

 /s/ Gene E.K. Pratter
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

13

Appendix. Prejudgment Interest

| Annual Pay | Start Date | End Date | Number of Days | Pay (periodic) | Principal (rolling) | Adding Compound Interest | IRS Prime Rate | Daily Rate | Interest | Annual subtotal to compound |
|---|---|---|---|---|---|---|---|---|---|---|
| $10,245 | 5/30/20 | 5/31/20 | 2 | $56.14 | $56.14 | $56.14 | 5% | 0.014% | $0.02 | |
| $10,245 | 6/1/20 | 6/30/20 | 30 | $842.05 | $898.19 | $898.19 | 5% | 0.014% | $3.69 | |
| $10,245 | 7/1/20 | 7/31/20 | 31 | $870.12 | $1,768.32 | $1,768.32 | 3% | 0.008% | $4.51 | |
| $10,245 | 8/1/20 | 8/31/20 | 31 | $870.12 | $2,638.44 | $2,638.44 | 3% | 0.008% | $6.72 | |
| $10,245 | 9/1/20 | 9/30/20 | 30 | $842.05 | $3,480.49 | $3,480.49 | 3% | 0.008% | $8.58 | |
| $10,245 | 10/1/20 | 10/31/20 | 31 | $870.12 | $4,350.62 | $4,350.62 | 3% | 0.008% | $11.09 | |
| $10,245 | 11/1/20 | 11/30/20 | 30 | $842.05 | $5,192.67 | $5,192.67 | 3% | 0.008% | $12.80 | |
| $10,245 | 12/1/20 | 12/31/20 | 31 | $870.12 | $6,062.79 | $6,062.79 | 3% | 0.008% | $15.45 | |
| $10,245 | 1/1/21 | 1/31/21 | 31 | $870.12 | $6,932.92 | $6,932.92 | 3% | 0.008% | $17.66 | |
| $10,245 | 2/1/21 | 2/28/21 | 28 | $785.92 | $7,718.84 | $7,718.84 | 3% | 0.008% | $17.76 | |
| $10,245 | 3/1/21 | 3/31/21 | 31 | $870.12 | $8,588.96 | $8,588.96 | 3% | 0.008% | $21.88 | |
| $10,245 | 4/1/21 | 4/30/21 | 30 | $842.05 | $9,431.01 | $9,431.01 | 3% | 0.008% | $23.25 | |
| $10,245 | 5/1/21 | 5/31/21 | 31 | $870.12 | $10,301.14 | $10,301.14 | 3% | 0.008% | $26.25 | $169.67 |
| $10,245 | 6/1/21 | 6/30/21 | 30 | $842.05 | $11,143.19 | $11,312.86 | 3% | 0.008% | $27.89 | |
| $10,245 | 7/1/21 | 7/31/21 | 31 | $870.12 | $12,013.32 | $12,182.98 | 3% | 0.008% | $31.04 | |
| $10,245 | 8/1/21 | 8/31/21 | 31 | $870.12 | $12,883.44 | $13,053.11 | 3% | 0.008% | $33.26 | |
| $10,245 | 9/1/21 | 9/30/21 | 30 | $842.05 | $13,725.49 | $13,895.16 | 3% | 0.008% | $34.26 | |
| $10,245 | 10/1/21 | 10/31/21 | 31 | $870.12 | $14,595.62 | $14,765.28 | 3% | 0.008% | $37.62 | |
| $10,245 | 11/1/21 | 11/30/21 | 30 | $842.05 | $15,437.67 | $15,607.34 | 3% | 0.008% | $38.48 | |
| $10,245 | 12/1/21 | 12/31/21 | 31 | $870.12 | $16,307.79 | $16,477.46 | 3% | 0.008% | $41.98 | |
| $10,245 | 1/1/22 | 1/31/22 | 31 | $870.12 | $17,177.92 | $17,347.59 | 3% | 0.008% | $44.20 | |
| $10,245 | 2/1/22 | 2/28/22 | 28 | $785.92 | $17,963.84 | $18,133.50 | 3% | 0.008% | $41.73 | |
| $10,245 | 3/1/22 | 3/31/22 | 31 | $870.12 | $18,833.96 | $19,003.63 | 3% | 0.008% | $48.42 | |
| $10,245 | 4/1/22 | 4/30/22 | 30 | $842.05 | $19,676.01 | $19,845.68 | 4% | 0.011% | $65.25 | |
| $10,245 | 5/1/22 | 5/29/22 | 29 | $813.99 | **$20,490.00** | $20,659.67 | 4% | 0.011% | $65.66 | $509.80 |
| - | 5/30/22 | 5/31/22 | 2 | - | $20,490.00 | $21,169.47 | 4% | 0.011% | $4.64 | |
| - | 6/1/22 | 6/30/22 | 30 | - | $20,490.00 | $21,169.47 | 4% | 0.011% | $69.60 | |
| - | 7/1/22 | 7/31/22 | 31 | - | $20,490.00 | $21,169.47 | 5% | 0.014% | $89.90 | |
| - | 8/1/22 | 8/5/22 | 5 | - | $20,490.00 | $21,169.47 | 5% | 0.014% | $14.50 | |
| **Total** | | | | | | | | | **$858.11** | |